**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

ATC TIRES PRIVATE LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

TITAN TIRE CORPORATION

Defendant-Intervenor.

Court No. 26-02810

**PUBLIC VERSION**

Confidential Information Removed from Pages i, 3, 7, 10, 13, 15, 33, 36, 43 to 46

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Eric C. Emerson
Ron Kendler
Christopher G. Forsgren
Nicole Arellano-Brillembourg

STEPTOE LLP
1330 Connecticut Ave, NW
Washington, DC 20036
(202) 429-3000

October 22, 2026

## TABLE OF CONTENTS


I. STATEMENT PURSUANT TO USCIT R. 56.2(C) .......... 1

A. Administrative Determination Sought to Be Reviewed .......... 1

B. Questions Presented and Summary of Argument .......... 1

1. Was Commerce's decision to treat the entire amount of ATC's AAP import duty exemptions as a countervailable grant supported by substantial evidence and in accordance with law? .......... 1

2. Was Commerce's expansion of the measurement period for ATC's SEZ and EOU raw material duty exemptions supported by substantial evidence and in accordance with law? .. 2

3. Was Commerce's rejection of ATC's EPCGS corrections and its application of adverse facts available supported by substantial evidence and in accordance with law? .......... 2

4. Was Commerce's finding that ATC purchased water for less than adequate remuneration supported by substantial evidence and in accordance with law? .......... 3

5. Was Commerce's refusal to remove the duplicated 2021 EOU [ ] amounts from its amended final calculations in accordance with law? .......... 3

II. STATEMENT OF FACTS .......... 3

A. Overview .......... 3

B. ATC's Import Duty Exemptions Under the Advance Authorization Program .......... 4

C. ATC's Raw Material Duty Exemptions Under the SEZ and EOU Programs .......... 9

D. ATC's Import Duty Exemptions Under the Export Promotion Capital Goods Scheme .. 12

E. The GIDC Water Supply Regulation and ATC's Water Purchases .......... 14

F. The Duplicated 2021 EOU Amount in the Amended Final Results .......... 15

III. STANDARD OF REVIEW .......... 16

IV. ARGUMENT .......... 17

A. Commerce's Decision to Treat the Entire Amount of ATC's AAP Duty Exemptions as a Countervailable Grant Was Unsupported by Substantial Evidence and Contrary to Law .......... 17

1. 19 C.F.R. § 351.519 measures the benefit by reference to consumption, and § 351.519(a)(4) prescribes no particular form of governmental examination, contrary to Commerce's determination .......... 17

2. Commerce treated license closure as the governmental examination without explaining why 19

3. Commerce's finding that ATC's ad hoc norms "have not been fixed" is unsupported by substantial evidence .......... 22

4. Commerce required of ATC what it did not require of BKT under the same regulation in the same review .......... 23

5. In the alternative, Commerce was required to treat the unresolved exemptions as contingent-liability interest-free loans .......... 24

B. Commerce's SEZ and EOU Raw Material Benefit Calculation Was Unsupported by Substantial Evidence and Contrary to Law ... 27

1. Commerce's expansion of the raw material measurement period cannot be sustained on the grounds Commerce gave ... 28

a. Commerce departed from a methodology it had applied in two consecutive reviews 28

b. Commerce's account of its POR6 determination is contradicted by that determination ... 28

c. Commerce's remaining rationale is conclusory and does not address the closed-block change ... 29

d. Commerce declined to decide the predicate recurring/non-recurring question ... 30

2. Commerce did not address ATC's argument that the verified record bears on the portion of the exemptions extending to inputs not consumed in exported production ... 31

C. Commerce's Rejection of ATC's EPCGS Corrections and Application of Adverse Facts Available Was Unsupported by Substantial Evidence and Contrary to Law ... 34

1. Commerce rejected ATC's correction without weighing accuracy against finality, as Federal Circuit precedent requires ... 35

2. Commerce did not establish a threshold basis for facts available ... 38

3. Commerce made no separate finding that ATC failed to cooperate to the best of its ability ... 39

D. Commerce's Water LTAR Determination Rested on an Inverted Reading of the GIDC Regulation ... 41

1. Record evidence and Commerce's verification findings contradict its benefit determination ... 41

2. Commerce identified no benchmark reflecting prevailing market conditions ... 42

E. Commerce's Amended Final Results Failed to Remove the Duplicated 2021 EOU Amount ... 43

1. Commerce's stated ground for declining correction does not address the duplication 44

2. Record evidence confirms the duplication at issue ... 45

V. CONCLUSION AND RELIEF SOUGHT ... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABB, Inc. v. United States*,
273 F. Supp. 3d 1200 (Ct. Int'l Trade 2017) ....................44

*Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*,
334 F.3d 1284 (Fed. Cir. 2003)....................44

*Alloy Piping Prods., Inc. v. United States*,
201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002) ....................43

*Consolidated Bearings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003)....................40

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016).................... *passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................31

*Diamond Sawblades Mfrs.' Coal. v. United States*,
219 F. Supp. 3d 1368 (Ct. Int'l Trade 2017) ....................17, 21, 22, 42

*Goodluck India Ltd. v. United States*,
11 F.4th 1335 (Fed. Cir. 2021) ....................13, 34, 35, 37

*Guizhou Tyre Co. v. United States*,
523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ....................38, 40

*Gujarat Fluorochemicals Ltd. v. United States*,
153 F.4th 1376 (Fed. Cir. 2025) ....................19

*Kajaria Iron Castings Pvt. Ltd. v. United States*,
156 F.3d 1163 (Fed. Cir. 1998)....................27, 33, 43

*Matra Ams., LLC v. United States*,
703 F. Supp. 3d 1371 (Ct. Int'l Trade 2024) ....................33

*Maverick Tube Corp. v. United States*,
857 F.3d 1353 (Fed. Cir. 2017)....................40

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019).................... *passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................17, 29, 42

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)....................39, 40, 41

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995)....................35, 36, 37, 38

*Nucor Corp. v. United States*,
600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ....................22

*POSCO v. United States*,
977 F.3d 1369 (Fed. Cir. 2020)....................43

*Royal Thai Government v. United States*,
436 F.3d 1330 (Fed. Cir. 2006)....................34

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004)....................28, 29

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)....................17, 28, 29, 31

*SKF USA Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011)....................28, 30

*Ticaret A.S. v. United States*,
633 F. Supp. 3d 1276 (Ct. Int'l Trade 2023) ....................18, 24, 25, 45

*Timken U.S. Corp. v. United States*,
434 F.3d 1345 (Fed. Cir. 2006).................... *passim*

*Titan Tire Corp. v. United States*,
799 F. Supp. 3d 1319 (Ct. Int'l Trade 2025) ....................18, 19, 23, 24

*Ulasim Sanayi A.S. v. United States*,
498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ....................27, 33

*Universal Tube & Plastic Indus., Ltd. v. United States*,
586 F. Supp. 3d 1312 (Ct. Int'l Trade 2022) ....................16, 20

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................16, 19

19 U.S.C. § 1671(a) .................... *passim*

19 U.S.C. § 1677(5)(B)....................32

19 U.S.C. § 1677(5)(E)(iv) ....................3, 41, 42

19 U.S.C. § 1677e(a)....................3, 37, 38

19 U.S.C. § 1677e(b) ....................3, 39

19 U.S.C. § 1677f(i)....................27

19 U.S.C. § 1677f(i)(2)(A)(iii)(I) ....................29, 31, 33

19 U.S.C. §§ 1677m(d) through (f)....................14

19 U.S.C. § 1677m(e) ....................3, 14, 38

Tariff Act of 1930 Section 701(a)....................26

**Regulations**

19 C.F.R. § 351.224(c)(2)(i) ....................15

19 C.F.R. § 351.224(f) ....................3, 15, 43, 44

19 C.F.R. § 351.505(e)(1).................... *passim*

19 C.F.R. § 351.505(e)(2)....................8, 25

19 C.F.R. § 351.511 ....................3, 41

19 C.F.R. § 351.511(a)(2)....................42

19 C.F.R. § 351.519 ....................17, 31

19 C.F.R. § 351.519(a)....................17

19 C.F.R. § 351.519(a)(1)(ii) .................... *passim*

19 C.F.R. § 351.519(a)(4).................... *passim*

19 C.F.R. § 351.519(a)(4)(i), (ii) ....................18

19 C.F.R. § 351.519(a)(4)(ii) ....................19, 20, 21

19 C.F.R. § 351.524(c)(1)....................10, 30

19 CFR 351.505(e)(2)....................25

19 CFR 351.519(a)(1)(ii)....................12, 32

19 CFR 351.519(a)(4)....................7, 12, 32

19 CFR 351.519(a)(4)(ii) ........ 8, 23

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ........ 18, 20

**Administrative Determinations**

*Certain New Pneumatic Off-the-Road Tires From India: Amended Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 23,063 (Apr. 29, 2026) ........ *passim*

*Certain New Pneumatic Off-the-Road Tires From India: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 84,331 (Oct. 22, 2024) ........ 10

*Certain New Pneumatic Off-the-Road Tires From India: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 13,285 (Mar. 19, 2026) ........ *passim*

*Certain New Pneumatic Off-the-Road Tires From India: Preliminary Results of Countervailing Duty Administrative Review; 2023*, 90 Fed. Reg. 30,863 (July 11, 2025) ........ *passim*

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 38,867 (May 8, 2024) ........ 3

*Polyester Textured Yarn From India: Final Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 63,848 (Nov. 19, 2019) ........ 40

# I. STATEMENT PURSUANT TO USCIT R. 56.2(C)

## A. Administrative Determination Sought to Be Reviewed

Plaintiff ATC Tires Private Ltd. ("ATC") contests the final results of the U.S. Department of Commerce ("Commerce") in the seventh administrative review of the countervailing duty ("CVD") order covering certain new pneumatic off-the-road ("OTR") tires from India (Case No. C-533-870) for entries during the period of review ("POR") of January 1, 2023 to December 31, 2023 ("POR7"). *See Certain New Pneumatic Off-the-Road Tires From India: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 13,285 (Mar. 19, 2026) ("*Final Results*") (P.R. 27) and accompanying Issues and Decision Memorandum ("Final IDM") (P.R. 28); *see also Certain New Pneumatic Off-the-Road Tires From India: Amended Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 23,063 (Apr. 29, 2026) ("*Amended Final Results*") (P.R. 11) and accompanying Issues and Decision Memorandum ("Amended Final IDM") (P.R. 12).

## B. Questions Presented and Summary of Argument

### 1. Was Commerce's decision to treat the entire amount of ATC's Advance Authorization Program ("AAP") import duty exemptions as a countervailable grant supported by substantial evidence and in accordance with law?

**No.** Under 19 C.F.R. § 351.519(a)(4), Commerce evaluates what the foreign government did to confirm which inputs were consumed in exported production and does not prescribe a particular documentary form. Nevertheless, Commerce countervailed all of ATC's exemptions because the Government of India ("GOI") neither issued an export obligation discharge certificate nor conducted an on-site visit, without explaining the relevance of such certificate. Commerce's own verification findings contradict the notion that ATC's ad hoc norms were not "fixed," and Commerce required of ATC what it did not require of the other mandatory

respondent in the same review. In the alternative, Commerce was required to measure the unresolved exemptions as contingent-liability interest-free loans under 19 C.F.R. § 351.505(e)(1) rather than as grants of the full principal.

**2. Was Commerce's expansion of the measurement period for ATC's Special Economic Zone ("SEZ") and Export Oriented Unit ("EOU") raw material duty exemptions supported by substantial evidence and in accordance with law?**

**No.** Commerce measured the benefit on every raw material exemption ATC accrued across an open five-year block and, for the first time in any segment of this proceeding, on exemptions from closed blocks. It justified such departure from the methodology that it applied in the two preceding reviews by asserting that it had "clearly noted this error" in the prior review. But in that review, Commerce rejected a request to do so solely because the relevant data were not on the record. Its justification for the change otherwise — that the prior methodology "did not adequately capture the benefit" — announces a result rather than explaining one, and Commerce declared "moot" the recurring versus non-recurring benefit question that determines whether pre-POR exemptions may be reached at all. Nor did Commerce address ATC's verified export and domestic sales data.

**3. Was Commerce's rejection of ATC's Export Promotion Capital Goods Scheme ("EPCGS") corrections and its application of adverse facts available supported by substantial evidence and in accordance with law?**

**No.** While preparing for verification, ATC identified a discrepancy in its manual EPCGS records, reconciled the corrected figures to the GOI's own EPCGS portal, and disclosed them at the outset of verification in the manner prescribed by Commerce's verification agenda — all roughly two months before the *Preliminary Results*. Commerce rejected the correction solely because of its magnitude, without weighing finality, burden, and accuracy, as required by Federal Circuit precedent; and then treated the resulting gap as the predicate for adverse facts

available. Commerce made none of the findings required by 19 U.S.C. §§ 1677e(a) and 1677m(e), and drew an adverse inference without making the findings required by Section 1677e(b).

**4. Was Commerce's finding that ATC purchased water for less than adequate remuneration ("LTAR") supported by substantial evidence and in accordance with law?**

**No.** Commerce's finding rests on the premise that, because consumers outside the Gujarat Industrial Development Corporation ("GIDC") industrial estate pay twice the in-estate rate, ATC's in-estate rate is a 50 percent discount. That inverts the GIDC Regulation, under which Article 5 fixes the estate rate as the baseline and Article 17 imposes a doubled charge as a surcharge outside of the estate, which Commerce verifiers described and Commerce never addressed. Commerce also identified no benchmark reflecting prevailing market conditions, as required by 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511.

**5. Was Commerce's refusal to remove the duplicated 2021 EOU [ ] amounts from its amended final calculations in accordance with law?**

**No.** Commerce's 2021 EOU raw material calculation counted the same [ ] amounts twice. Commerce declined to correct such duplication, stating that its decision to include the [ ] in the benefit numerator was intentional. However, while including the [ ] may be a methodological choice, counting them twice is not. Duplication falls within the literal terms of 19 C.F.R. § 351.224(f), and an error apparent on the face of Commerce's own calculation requires correction.

## II. STATEMENT OF FACTS

### A. Overview

Commerce initiated the POR7 review on May 2, 2024. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 38,867 (May 8, 2024) (P.R. 216),

later selecting ATC for individual examination as a mandatory respondent. Memorandum to Jill E. Pollack, through Mark Hoadley, from Trinity Johnson, Re: 2023 Countervailing Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from India: Respondent Selection (Aug. 15, 2024) (C.R. 301).

In its preliminary results, Commerce calculated a subsidy rate of 8.27 percent for ATC. *Certain New Pneumatic Off-the-Road Tires From India: Preliminary Results of Countervailing Duty Administrative Review; 2023*, 90 Fed. Reg. 30,863 (Jul. 11, 2025) ("*Preliminary Results*") (P.R. 62), accompanying Issues and Decision Memorandum, ("Prelim IDM") (P.R. 63).

Following parties' case and rebuttal briefs, Commerce issued the *Final Results*, reducing ATC's subsidy rate to 5.96 percent. *See* Final IDM (P.R. 28). Both Plaintiff and Defendant-Intervenor, Petitioner Titan Tire Corporation ("Titan" or "Petitioner") filed comments on ministerial errors contained therein. Letter to The Honorable Howard Lutnick from Jennifer M. Smith-Veluz, Re: Certain New Pneumatic Off-the-Road Tires from India: Titan Tire Corporation's Ministerial Error Comments (Mar. 23, 2026) (C.R. 7); Letter to The Honorable Howard Lutnick from Eric C. Emerson, Re: Certain New Pneumatic Off-the-Road Tires from India: ATC Tires Private Ltd.'s Ministerial Error Comments (Mar. 23, 2026) ("ATC Ministerial Error Comments") (C.R. 8). Commerce subsequently issued the *Amended Final Results*. *See Amended Final Results*; Amended Final IDM. Plaintiff filed a summons with this Court on April 17, 2026 and a complaint on April 27, 2026. *See* ECF 1, ECF 10, ECF 19. Below, Plaintiff addresses the facts of each issue on which this appeal is based.

### B. ATC's Import Duty Exemptions Under the Advance Authorization Program

Pursuant to the Advance Authorization Program ("AAP"), the Government of India ("GOI") exempts imported raw materials from import duties "in accordance with pre-approved applications to consume such materials into exported products." Prelim IDM at 14 (P.R. 63). The

AAP operates license by license, and where the GOI has not published standard input-output norms for a product — as is the case for ATC's OTR tires — a manufacturer must apply for each license based on product-specific ad hoc norms that it proposes and substantiates with technical production documentation. Memorandum to The File, through Gene H. Calvert, from Trinity Johnson, Re: Countervailing Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from India: Verification of the Questionnaire Responses of ATC Tires Private Limited (Jun. 3, 2025) ("ATC Verification Report") at 5 (C.R. 40).

As Commerce verified, "the GOI examines the information submitted by ATC at two steps in the license issuing process." *Id.* at 7. First, the GOI provisionally grants the license on the basis of ATC's proposed ad hoc norms, which the Norms Committee of India's Directorate General of Foreign Trade ("DGFT") evaluates through an exchange of documents with the company. *Id.* at 5. As part of this process, the DGFT Norms Committee may issue deficiency letters soliciting "reports related to waste, input consumption, and other production information." *Id.* at 6-7. ATC, in turn, provides documentation certified by third-party chartered engineers, after which the GOI may approve the provisional norms or specify revised norms. *Id.*

Approval by the GOI fixes the input-output ratio, capping the quantity of each input that ATC AP (a wholly owned subsidiary of ATC responsible for operating the Andhra Pradesh production facility)[1] may import duty-free under the license, as well as the corresponding quantity of OTR tires that it must export incorporating those inputs. *Id.* at 5-6. ATC must also furnish a bank guarantee "to custom{s} authorities to cover the exemption from customs duty," *id.* at 7, and if it imports input material in excess of the cap or fails to export the required quantity of OTR tires, then it must repay the associated duties with interest. Letter to the Honorable Howard Lutnick

[1] The remainder of the brief refers to ATC and ATC AP collectively as "ATC."

from Eric C. Emerson, Re: Certain Pneumatic Off-the-Road Tires from India: ATC'S Case Brief (Aug. 11, 2025) ("ATC Case Brief") at 14 (C.R. 19); Letter to the Honorable Gina Raimondo from Eric C. Emerson, Re: Certain New Pneumatic Off-the-Road Tires from India: ATC Tires Private Ltd.'s Response to Section III of Initial Countervailing Duty Questionnaire (Oct. 16, 2024) ("ATC Section III IQR") at 8 (C.R. 219).

Second, once the licensed import and export activity is complete, ATC applies for an Export Obligation Discharge Certificate ("EODC"), submitting customs entry and bill of entry forms for every transaction under the license. The GOI then examines whether ATC met its export obligations and imported the appropriate input amounts relative to the ad hoc norms already established under that license. ATC Verification Report at 6-7 (C.R. 40).

Commerce further verified that the GOI's first step occurred and resulted in approved norms. Examining one of ATC's license applications, Commerce "noted that ATC's submitted norms were provisionally accepted, and then were ultimately approved after the vetting stage," and catalogued the Norms Committee's minutes; the GOI's deficiency questions; ATC's responses; the signed chartered engineering statements; and "the GOI's approval of the ad hoc norms." *Id.* at 6; Letter to the Honorable Howard Lutnick from Eric C. Emerson, Re: Certain New Pneumatic Off-the-Road Tires from India: ATC Tires Private Ltd. Verification Exhibits ("ATC Verification Exhibits") at VE-7 (C.R. 114-17).

Commerce also confirmed that the approved input-output ratios for the inputs that it examined "did not change" from application through the official license; verified ATC's license-specific tracking of duty-free imports against corresponding exports; and tied the required bank guarantees to the corresponding licenses. ATC Verification Report at 6-7 (C.R. 40). And, Commerce verified that during POR7, ATC fulfilled its export obligations for two reported

licenses and applied for an EODC on [ ] of them on [ ], expecting issuance within four months. *Id.* at 7. At the time of verification, the GOI had not issued an EODC for any of ATC's reported licenses. *Id.*

In the *Preliminary Results*, Commerce determined that ATC's norms "are provisional because the norms have not been fixed by the DGFT and an {EODC} has yet to be issued to ATC because it has not yet fulfilled its export obligation to the DGFT{.}" Prelim IDM at 16 (P.R. 63). Commerce went on to conclude that, "until {ATC's} facility is granted full verification of its ad hoc norms and an export obligation discharge certificate issued," the program conferred a benefit under 19 C.F.R. § 351.519(a)(1)(ii). Prelim IDM at 16 (P.R. 63).

Section 351.519(a)(4) treats the entire exemption as a benefit unless the foreign government (i) maintains a reasonable and effective system to confirm which inputs are consumed in exported production and in what amounts, or (ii) has examined the actual inputs to confirm the same. 19 C.F.R. § 351.519(a)(4). The inquiry thus asks what the foreign government did to link the duty-free inputs to the exported merchandise.

In the *Preliminary Results*, Commerce simply stated that "{b}ecause {ATC's} ad hoc norms are provisional in nature, . . . the documentation provided does not satisfy the exceptions set forth in 19 CFR 351.519(a)(4)." *Id.* Commerce further treated the benefit as recurring and expensed the full exemption amount in the POR. *Id.*; Memorandum to The File from Trinity Johnson, Re: ATC Tires Private Limited Preliminary Analysis Memorandum (Jul. 7, 2025) ("ATC Prelim Analysis Memorandum") at 2 (C.R. 22).

ATC argued in its case brief that the GOI's examination satisfies Section 351.519(a)(4) when the DGFT finalizes the ad hoc norms, the step at which the GOI reviews the technical documentation and fixes the binding input-output ratio. Because ATC must repay any excess

exemption with interest, ATC argued, the EODC is merely a license-closure step. ATC Case Brief at 12-15 (C.R. 19). In the alternative, ATC argued that if the exemptions are not final until the EODC issues, they remain contingent and must be treated as contingent-liability interest-free loans under 19 C.F.R. § 351.505(e)(1), with the benefit measured as interest rather than the full exemption amount. *Id.* at 15-16.

In the *Final Results*, Commerce continued to find ATC's AAP exemptions "countervailable in their entirety, pursuant to 19 CFR 351.519(a)(4)(ii)." Final IDM at 25 (P.R. 28). Commerce concluded that the GOI's examination of ATC was inadequate, most notably because ATC had not undergone an on-site verification by the DGFT, and repeated that ATC's norms remained provisional because the DGFT had not fixed them and that no examination of the actual inputs consumed in exported production had been completed for purposes of Section (a)(4)(ii). *Id.* at 25-26. Commerce did not address ATC's extensive evidence, reviewed by Commerce at verification, namely the Norms Committee correspondence, the chartered-engineer certifications, the GOI's approval letter, the verified stability of the approved ratios, the license-level controls, or the bank guarantees. *See id.* at 25-27.

Commerce rejected ATC's alternative argument for contingent-liability treatment of the AAP exemptions, reasoning that the GOI had not taken "meaningful action" to determine whether ATC claimed excess exemptions or to collect repayment. *Id*. at 26-27. In support, Commerce pointed to the fact that the GOI: (1) had not yet issued the EODC for which ATC had applied; and (2) had not prompted ATC to apply for EODCs on its other licenses. *Id.* Commerce therefore calculated the benefit as "the entire amount of an exemption," citing 19 C.F.R. §§ 351.505(e)(2) and 351.519(a)(1)(ii) — resulting in a subsidy margin of 0.63 percent for the AAP. *Id*. at 7, 27.

In the POR7 review, Commerce determined that the other mandatory respondent, Balkrishna Industries Ltd. ("BKT"), which like ATC used ad hoc norms based on its own production experience, "did not benefit from the program." Prelim IDM at 15 (P.R. 63). Unlike its evaluation of ATC, Commerce identified supporting record evidence (audited product-specific consumption calculations; the GOI's verification report and the underlying input-output ratio calculations; wastage-rate determinations; GOI deficiency letters; and documents requiring payment of duties on imports not consumed in exported products). *Id.* Moreover, Commerce made no mention of an EODC in its AAP analysis of BKT. *See id.*; Final IDM at 24-25, 34-35 (P.R. 28).

**C. ATC's Raw Material Duty Exemptions Under the SEZ and EOU Programs**

ATC operates a Special Economic Zone ("SEZ") unit in Tamil Nadu and an Export Oriented Unit ("EOU") in Gujarat, each exempt from import duties on capital goods and raw materials. Prelim IDM at 19-20 (P.R. 63); ATC Verification Report at 10, 13 (C.R. 40). Eligibility for duty-free treatment under each program depends on a net foreign exchange ("NFE") requirement, under which the unit's foreign exchange earnings from exports must exceed its outflows, measured cumulatively over a five-year period. ATC Verification Report at 9 (C.R. 40). Commerce found that the GOI lacks a system to confirm which inputs are consumed in exported production, in accordance with 19 C.F.R. § 351.519(a)(4). Final IDM at 15-16 (P.R. 28).

In the 2021 and 2022 administrative reviews ("POR5" and "POR6" reviews, respectively), Commerce treated ATC's SEZ and EOU raw material duty exemptions as contingent-liability interest-free loans under 19 C.F.R. § 351.505(e)(1), using as the principal only the exemptions accrued during the POR and measuring the benefit as the interest on that amount. *See* Letter to the Honorable Gina Raimondo from Jennifer M. Smith-Veluz, Re: Certain New Pneumatic Off-the-Road Tires from India: Rebuttal, Clarifying, and Correcting Factual Information to the Initial

Questionnaire Responses (Nov. 19, 2024) at Exhibit 3 (C.R. 197). Because the principal was confined to POR-year exemptions, raw material exemptions from (1) earlier years of an open five-year block, and (2) closed blocks, were not captured. *Id.*

In the POR6 review, Petitioner asked Commerce to expand the principal to include raw material exemptions from all years of the open five-year block. *See Certain New Pneumatic Off-the-Road Tires From India: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 84,331 (Oct. 22, 2024) and accompanying Issues and Decision Memorandum ("POR6 Final IDM") at 12. Commerce declined solely because information on earlier raw material imports within the unclosed five-year period was not on the record, Commerce had not requested it, and no evidence suggested ATC had failed to cooperate; the issue was therefore "moot" and Commerce added only that it would collect the information for subsequent reviews. *Id.* at 14. Commerce did not state that its existing methodology was erroneous. *See id.*

At verification, company officials demonstrated how they extracted sales data from ATC's SAP accounting system and "identified sales of merchandise under consideration (MUC), non-MUC, domestic sales, export sales, and other sales." ATC Verification Report at 4 (C.R. 40). Of the verified data, export sales of subject merchandise from the SEZ and EOU units accounted for [ ] percent of total subject merchandise sales from those units during the POR, leaving [ ] percent sold domestically. ATC Case Brief at 6-9 and n.15 (C.R. 19); Letter to the Honorable Howard Lutnick from Eric C. Emerson, Re: Certain Pneumatic Off-the-Road Tires from India: ATC Tires Private Limited Revised Databases Submission Following Verification (Jun. 6, 2025), Exhibit BEN, "Sales-Denominators" (C.R. 39).

In the *Preliminary Results*, Commerce expensed the POR-year raw material exemptions as a recurring grant under 19 C.F.R. § 351.524(c)(1), while continuing to treat the capital goods

exemptions as contingent-liability loans, pending completion of the NFE requirement. ATC Prelim Analysis Memorandum at 3-4 (C.R. 22). Although Commerce described the preliminary grant as covering all exemptions accrued since 2019, Final IDM at 17, the preliminary calculation used only POR-year exemptions. *Id.*

In its case brief, ATC argued that Commerce should apply the verified domestic-sales share as a conservative measure of the maximum potentially excess amount under Section 351.519(a)(1)(ii), and that Commerce had abandoned its POR5 and POR6 methodology without explanation. ATC Case Brief at 6-12 (C.R. 19).

In the *Final Results*, Commerce made two changes. First, as to the open five-year block, Commerce explained that because "the five-year period ends in 2024, the exemptions were not yet finalized," and thus, it should have measured the benefit as only the interest payable on that liability during the POR under 19 C.F.R. § 351.505(e)(1). Final IDM at 17 (P.R. 28). Commerce therefore returned to contingent-liability treatment. *Id.* However, in a marked change from its earlier treatment, Commerce computed the benefit on raw material exemptions accrued in every year of the open block from 2019 through 2023. Memorandum to The File from Mark Hoadley, Re: ATC Tires Private Limited {Final} Analysis Memorandum (Mar. 17, 2026) ("Final Calculation Memorandum") at 1 (C.R. 11). And, because it was no longer expensing the total amount as a recurring grant, Commerce declared that "the arguments regarding whether that grant is recurring or non-recurring are moot." Final IDM at 17 (P.R. 28).

Second, for the first time in any segment of the proceeding, Commerce included in its subsidy calculation raw material exemptions from closed five-year blocks, on the rule that exemptions under these programs "are treated as grants disbursed at the end of the five-year period when the NFE is satisfied." *Id.* at 18-19; Final Calculation Memorandum at Attachment II (C.R.

10). In prior reviews, Commerce had applied that rule to capital goods exemptions, but never to raw material exemptions. POR6 Final IDM at 11-14. Commerce did not acknowledge that such treatment of closed block raw material exemptions in POR7 was new. *Id.*

Commerce justified the new methodology on two grounds: (1) that the prior methodology had inadequately captured the benefit by capturing only the interest on exemptions during the prior PORs; and (2) that it had noted that error in the POR6 final results. *Id.* at 16-17. Commerce acknowledged that its decision was new for POR7, *id.* at 16, but identified no change in the operation of the SEZ or EOU programs; in the NFE requirement; or in the governing regulations that would justify or support the change in methodology.

Finally, Commerce concluded that "ATC misapplies 19 CFR 351.519(a)(1)(ii), as an exception is explained in 19 CFR 351.519(a)(4)," found that the GOI had no system to identify inputs used in exported merchandise, and ultimately concluded that the entire amount confers a benefit, citing the proposition "that when a government is lacking an appropriate system under 19 CFR 351.519(a)(4), Commerce may countervail the entire amount of the duty exemptions." Final IDM at 15-17 (P.R. 28). Commerce did not address ATC's verified export and domestic sales data. *See id.* at 15-17.

### D. ATC's Import Duty Exemptions Under the Export Promotion Capital Goods Scheme

The Export Promotion Capital Goods Scheme ("EPCGS") permits companies to import capital goods at reduced or zero customs duty in exchange for a commitment to meet future export obligations. ATC Section III IQR at 27 (C.R. 219). ATC reported import duty exemptions received under the program for capital goods used in its operations. *Id.* at Exhibit EPCG-1 (C.R. 208). Because the exemption produces no payable or receivable, ATC does not record the

exempted amounts in its accounting system, instead tracking each license manually in a spreadsheet. ATC Verification Report at 17-18 (C.R. 40).

Consistent with its practice, Commerce's verification agenda directed ATC, if it "identified errors in the responses while preparing for verification," to provide at the outset of verification "a list of the errors, . . . original documentation to show the corrections," and "a chart that shows the magnitude of changes to quantitative data." *Id.* at 1. This is known as the process of submitting "minor corrections," through which Commerce can accept clerical corrections to information already on the record, including "clerical errors resulting from inaccurate copying, duplication, or the like" at the outset of verification. *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021).

In preparing for verification, ATC reconciled its manual EPCGS records against the GOI's EPCGS portal and discovered that it had misreported duty amounts for certain licenses and omitted others for 2022 and 2023. ATC Verification Report at 18 (C.R. 40). ATC disclosed this discrepancy at the outset of verification and tendered revised EPCGS data with license-level supporting documentation. *Id.*; ATC Verification Exhibits at VE-6 (C.R. 117-18).

Commerce declined to accept the revision as a minor correction. It found that ATC "underreported the total amount of non-cenvatable duties in [ ] by [ ] percent and in [ ] by [ ] percent," and concluded that "due to the nature of these inconsistencies, we were not able to fully verify ATC's reporting of EPCGS." *Id.* Commerce nonetheless continued to examine the program, and in doing so accessed the GOI's EPCGS portal itself — the same authoritative source against which ATC had reconciled the rejected correction. ATC Verification Exhibits at VE-6 (at p. C-0012) (C.R. 117-18).

In the *Preliminary Results,* Commerce found that ATC "failed to report" certain 2022 and 2023 EPCGS benefits, determined that the proposed revisions were not minor corrections, and applied adverse facts available ("AFA") to the program using BKT's calculated EPCGS rate of 0.86 percent. Prelim IDM at 8-9 (P.R. 63).

ATC argued in its case brief that the corrected information satisfied 19 U.S.C. § 1677m(e), that Commerce had not performed the analysis required by 19 U.S.C. §§ 1677m(d) through (f), and that ATC had acted to the best of its ability. ATC Case Brief at 16-27 (C.R. 19). In the Final Results, Commerce rejected those arguments and continued to apply AFA, using BKT's revised rate of 0.47 percent. Final IDM at 36-39 (P.R. 28).

**E. The GIDC Water Supply Regulation and ATC's Water Purchases**

ATC's Gujarat plant is located within an industrial estate administered by the Gujarat Industrial Development Corporation ("GIDC") and purchases water from GIDC at the fixed estate rate. ATC Section III IQR at Exhibit SGOG-1A (C.R. 204); ATC Verification Report at 20 (C.R. 40).

The GIDC Water Supply Regulation establishes two key steps. First, Article 5 provides that "{i}n an industrial estate, the charge for water supply to the consumer shall be calculated at such rate as may be fixed by the {GIDC} from time to time for that estate." ATC Section III IQR at Exhibit SGOG-1A (C.R. 204). Second, Article 17 provides that where the GIDC supplies water to premises outside its territorial limits, the consumer pays double the prevailing rate. *Id.* Commerce verifiers described these provisions, noting that ATC's plant "automatically receives water from GIDC at GIDC-prescribed rates" and that "plants located outside of the GIDC area are charged at a 100 percent markup." ATC Verification Report at 20 (C.R. 40).

In the *Preliminary Results*, Commerce found that this arrangement conferred a countervailable benefit, reasoning that because outside-area consumers pay twice the estate rate,

consumers within the estate receive a 50 percent discount, and thus, that ATC purchased water for less than adequate remuneration ("LTAR"). Prelim IDM at 22-23 (P.R. 63).

ATC argued in its case brief that the estate rate is the regulatory baseline rather than a discounted rate, that the Article 17 charge is a surcharge imposed on an exceptional class of transactions, and that no party had placed benchmark evidence on the record showing that GIDC rates are below those paid by comparable industrial users. ATC Case Brief at 27-29 (C.R. 19). In the *Final Results*, Commerce continued to find that ATC purchased water for LTAR because, in its view, the in-estate rate constitutes a 50 percent discount. Final IDM at 41 (P.R. 28).

**F. The Duplicated 2021 EOU Amount in the Amended Final Results**

Commerce's final SEZ and EOU calculations included [ ] amounts in the benefit numerator. Final IDM at Comment 2 (P.R. 28); Final Calculation Memorandum (C.R. 11). Pursuant to 19 C.F.R. § 351.224(c)(2)(i), ATC timely filed ministerial error comments on March 23, 2026, and in its April 2, 2026 rebuttal comments, clarified a further aspect of an error it had raised: for 2021, Commerce's EOU raw material exemption calculation counted the same [ ] amounts twice. ATC Ministerial Error Comments at 2-3 (C.R. 8-9); Letter to the Honorable Howard Lutnick from Eric C. Emerson, Re: Certain New Pneumatic Off-the-Road Tires from India: ATC Tires Private Ltd.'s Rebuttal to Petitioner's Ministerial Error Comments (Apr. 2, 2026) ("ATC Ministerial Error Rebuttal Comments") at 5-7 and Exhibit ME-2 (C.R. 5-6). ATC supplied revised worksheets removing the duplication. ATC Ministerial Error Rebuttal Comments at Exhibit ME-2 (C.R. 5).

Commerce declined to correct the 2021 duplication. Addressing the allegation, Commerce stated that its change to the benefit calculation was intentional, that the calculation contained no arithmetic or clerical error of the kind described by Section 351.224(f), and that the change from the *Preliminary Results* corrected an error in those results. Amended Final IDM at 2-4 (P.R. 12).

Commerce found no discrepancy between its stated intention and the data on which it relied. *Id.* at 4. Commerce did not separately address whether the 2021 amounts had been included twice. *See id.* at 2-4.

Commerce granted other allegations in the same memorandum, agreeing that it had inadvertently excluded closed-block grants from the SEZ and EOU benefit and inadvertently treated the Section 10AA loan for an incorrect period. *Id.* at 5-7. Commerce amended the *Final Results* accordingly, increasing ATC's rate to 7.44 percent, but left the duplicated 2021 EOU amount in place. *Id.* at 7; Memorandum to The File and Mark Hoadley from Sarah Keith, Re: ATC Tires Private Limited Amended Final Analysis Memorandum (Apr. 22, 2026) (C.R. 1).

## III. STANDARD OF REVIEW

This Court must hold unlawful any determination, finding, or conclusion found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Universal Tube & Plastic Indus., Ltd. v. United States*, 586 F. Supp. 3d 1312, 1317 (Ct. Int'l Trade 2022), and its substantiality "must take into account whatever in the record fairly detracts from its weight{.}" *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).

Commerce "has discretion to make reasonable choices within statutory constraints," but it "must provide an explanation that is adequate to enable the court to determine whether the choices are in fact reasonable, including as to calculation methodologies." *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019). The required explanation "must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *CS Wind*, 832 F.3d at 1376. "An administrative determination is inadequate

when the agency 'entirely failed to consider an important aspect of the problem.'" *Diamond Sawblades Mfrs.' Coal. v. United States*, 219 F. Supp. 3d 1368, 1375 (Ct. Int'l Trade 2017) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action, furthermore, "is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## IV. ARGUMENT

### A. Commerce's Decision to Treat the Entire Amount of ATC's AAP Duty Exemptions as a Countervailable Grant Was Unsupported by Substantial Evidence and Contrary to Law

Commerce countervailed one hundred percent of ATC's AAP import duty exemptions solely because the GOI neither issued EODCs for the licenses at issue nor conducted an on-site exercise at ATC's facility. Final IDM at 25-27 (P.R. 28). That determination is neither supported by substantial evidence nor in accordance with law. As discussed below, Commerce never explained why EODC issuance — a license-closure step — is the point at which Section 351.519(a)(4) is satisfied. Rather, Commerce rested on a factual premise contradicted by its own verification. And, it demanded of ATC what it did not of BKT in the same review. Finally, and in the alternative, Commerce was required to measure the unresolved exemptions as contingent-liability interest-free loans rather than as an unconditional grant.

#### 1. Contrary to Commerce's determination, 19 C.F.R. § 351.519 measures the benefit by reference to consumption, and § 351.519(a)(4) prescribes no particular form of governmental examination

Section 351.519 of Commerce's regulation governs the "{r}emission or drawback of import charges upon export." *See* 19 C.F.R. § 351.519(a). For an exemption, "a benefit exists to the extent that the exemption extends to inputs that are not consumed in the production of the exported product, making normal allowances for waste." 19 C.F.R. § 351.519(a)(1)(ii).

Section 351.519(a)(4) supplies a default rule and two exemptions. That is, Commerce "will consider the entire amount of an exemption, deferral, remission or drawback to confer a benefit, unless" the government either (i) "has in place and applies a system or procedure{,}" reasonable and effective for its intended purpose, "to confirm which inputs are consumed" in exported production "and in what amounts"; or (ii) "has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts." 19 C.F.R. § 351.519(a)(4)(i), (ii).

One feature of Section 351.519(a)(4), established by the preamble to Commerce's CVD regulations, is crucial in this case. *See Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ("CVD Preamble"); *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 633 F. Supp. 3d 1276, 1280 (Ct. Int'l Trade 2023) ("The interpretations given in the <u>CVD Preamble</u> should be given deference as an official regulatory interpretation that expresses authoritative departmental position to an interpretation of its underlying regulation.") (citation omitted, emphasis original). Specifically, Commerce's regulation neither defines "an examination of actual inputs," nor specifies "the exact means to be used by the government in question to conduct the examination." *Titan Tire Corp. v. United States*, 799 F. Supp. 3d 1319, 1324 (Ct. Int'l Trade 2025). However, in the CVD Preamble, Commerce declined commenters' request to specify a qualifying methodology, explaining that "clarification regarding the type of system or procedure is unnecessary because any system, regardless of the type, must meet the standards set forth in paragraph (a)(4) in order to be non-countervailable." CVD Preamble, 63 Fed. Reg. at 65,384-85.

*Titan Tire* applied that standard to this program and the CVD order underlying this appeal. 799 F. Supp. 3d at 1321-22. This Court sustained Commerce's finding that the GOI carried out a qualifying examination of BKT's actual inputs, resting on the GOI's verification report confirming

consumption ratios, wastage determinations, deficiency letters, documents requiring payment of duties on imports not consumed in exported products, and third-party engineering and accounting audits. *Id.* at 1324-26. Moreover, the Court sustained Commerce's finding because the plaintiff "identifie{d} no evidence that detracts from Commerce's consideration and acceptance of the verification conducted by the GOI." *Id.* In sum, Commerce's regulation prescribes no particular procedural form for the verification, and no decision of this Court or the Federal Circuit holds that Section 351.519(a)(4)(ii) is satisfied only upon the issuance of a particular documentary instrument.

By grafting onto Section 351.519(a)(4) a documentary condition that Commerce's regulation does not contain, and that the Preamble expressly declined to impose, Commerce adopted a reading of its own regulation that the text does not support, thus making it contrary to law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *Gujarat Fluorochemicals Ltd. v. United States*, 153 F.4th 1376, 1381-83 (Fed. Cir. 2025). Such reading also renders the determination unsupported by substantial evidence, because Commerce neither "reasonably tie{d} the determination under review to the governing statutory standard" nor identified "what statutory interpretations the agency is adopting." *CS Wind*, 832 F.3d at 1376.

**2. Commerce treated license closure as the governmental examination without explaining why**

Commerce verifiers identified two distinct steps in the GOI's AAP administration. The first fixes the input-output ratio after the GOI reviews reports on waste, input consumption, and production; the second, after performance is complete, examines whether ATC "imported the appropriate input amounts relative to the ad hoc norms ***established under the license***" and closes the license. ATC Verification Report at 7 (C.R. 40) (emphasis added).

Section 351.519(a)(4)(ii) asks the first question, not the second. It asks whether the government "has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts." 19 C.F.R. § 351.519(a)(4)(ii). By treating the absence of license closure as dispositive of the adequacy of the GOI's examination, Commerce answered a different question: whether the GOI had finished confirming ATC's compliance with limits ***it had already fixed***. That question concerns the reconciliation of completed performance, not whether the GOI examined actual inputs. *See Universal Tube*, 586 F. Supp. 3d at 1321-23 (remanding where Commerce failed to perform the analysis required by the governing provision).

Commerce never identified what the EODC does, in terms grounded in Section 351.519(a)(4), that the GOI's examination and approval of the ad hoc norms does not. It never found that the EODC establishes or revises the input-output ratios, that it develops information about input consumption or wastage the Norms Committee process does not, or that its absence renders the approved ratios unreliable. Commerce verifiers described the EODC stage as measuring performance against norms already established under the license. ATC Verification Report at 7 (C.R. 40). Nor did Commerce reconcile its EODC requirement with the Preamble's refusal to prescribe any particular documentary form. CVD Preamble, 63 Fed. Reg. at 65,384-85.

And, Commerce failed to explain how ATC could receive an excess duty exemption at all upon the finalization of its ad hoc norms. Finalization fixes, on the face of the license, the maximum quantity of each input that may be imported duty-free and the corresponding quantity of OTR tires that must be exported incorporating those inputs. ATC Verification Report at 5-6 (C.R. 40). ATC must secure that exposure in advance through a bank guarantee covering the exempted duties — a requirement Commerce verified and tied to specific licenses, *id.* at 7 —and

noncompliance triggers repayment with interest. ATC Case Brief at 14 (C.R. 19); ATC Section III IQR at 8 (C.R. 219). Once the norms are finalized, the license structure leaves no mechanism by which ATC could retain an exemption on inputs not consumed in exported merchandise without triggering repayment. Commerce never addressed that consequence, and never explained what residual risk of excess exemption the EODC is supposed to guard against. Commerce's failure to address that evidence leaves its determination unsupported by substantial evidence. *CS Wind*, 832 F.3d at 1373.

Instead, Commerce offered conclusory declarations. Its statements that ATC's norms are "provisional in nature" and that the GOI's examination "is not adequate," Final IDM at 25-26 (P.R. 28), restate its conclusion rather than support it. Neither statement identifies any deficiency in what the Norms Committee reviewed, nor explains why Commerce's regulation demands more. The Federal Circuit rejected this same approach in *Mid Continent Steel & Wire*, holding that Commerce's characterization of an alternative methodology as "skew{ing}" the result "is a mere conclusion where, as here, it is unaccompanied by an explanation of why the right result, consistent with the relevant statutory purpose, should be different." 940 F.3d at 674.

Commerce's assessment also produced an internally incoherent determination. In the same passage declaring ATC's norms "provisional in nature because they have not been fixed by the DGFT," Commerce carried forward its finding that "while the theoretical norms have been approved, an examination of the actual inputs consumed in the production of the exported product has not been completed." Final IDM at 26 (P.R. 28). Commerce thus found simultaneously that the norms had been approved and that they had not been fixed — two synonyms for the same action.

Nor did Commerce apply a consistent standard, invoking Section 351.519(a)(4)(ii) while finding that ATC's system did not satisfy Section 351.519(a)(4)(i). *Id.* at 25-26. Commerce "cannot have it both ways," *Diamond Sawblades*, 219 F. Supp. 3d at 1373, and a determination for which the governing standard is indiscernible lacks the "clear rationale, supported by substantial evidence" and required by law. *Nucor Corp. v. United States*, 600 F. Supp. 3d 1225, 1238 (Ct. Int'l Trade 2022).

#### 3. Commerce's finding that ATC's ad hoc norms "have not been fixed" is unsupported by substantial evidence

Commerce's determination rests on the premise that ATC's ad hoc norms "have not been fixed by the DGFT." Final IDM at 26 (P.R. 28). Commerce found the Section 351.519(a)(4) exceptions unmet "{b}ecause {ATC's} ad hoc norms are provisional in nature," Prelim IDM at 16 (P.R. 63). The record refutes that premise, and Commerce failed to acknowledge the evidence that does so.

Specifically, Commerce examined at verification application documents for one of ATC's licenses, and found that the submitted norms were "provisionally accepted" and "ultimately approved after the vetting stage"; it catalogued the Norms Committee minutes, the GOI's deficiency questions, ATC's responses, the chartered-engineer certifications, and the GOI's written approval; and it confirmed that the approved input-output ratios for the inputs it tested "did not change" from application through official license. *See* **Section II.B** *supra*. ***None*** of this evidence appears in Commerce's analysis. *See* Final IDM at 25-27 (P.R. 28). Where "material and undisputed record evidence" bears directly on the agency's premise, "Commerce {i}s compelled to address this evidence," *Diamond Sawblades*, 219 F. Supp. 3d at 1375, and a determination that ignores the verified record bearing on its own factual predicate is not supported by substantial evidence. *CS Wind*, 832 F.3d at 1373.

A second, related finding is likewise unsupported by substantial evidence. Commerce stated that an EODC "has yet to be issued to {ATC} ***because it has not yet fulfilled its export obligation*** to the DGFT." Prelim IDM at 16 (P.R. 63) (emphasis added). Yet Commerce verifiers found to the contrary: "{d}uring the POR, ATC fulfilled its export obligations for two licenses reported." ATC Verification Report at 7 (C.R. 40). Commerce thus misattributed the absence of an EODC to non-performance. Commerce's stated condition therefore rests on factual premises its own verifiers contradicted and is unsupported by substantial evidence.

**4. Commerce treated ATC and disparately**

Commerce's only affirmative reason for finding the GOI's examination of ATC inadequate was comparative: "Comparing the process that the GOI subjected BKT to sheds light on the possible extent of the process and thus the inadequacy of the process to which ATC was subjected to when compared to BKT." Final IDM at 6 (P.R. 28). "Most notably," Commerce observed, "ATC did not partake in an on-site verification by the DGFT." Final IDM at 26 (P.R. 28). As to BKT, Commerce found that "the GOI has taken adequate and verified steps to ensure all materials imported duty free are incorporated into exported productions in accordance with 19 CFR 351.519(a)(4)(ii)." *Id.* at 34.

Commerce placed unreasonable emphasis on BKT's on-site verification. Every other factor on which Commerce relied for BKT — audited product-specific consumption calculations; ad hoc norms based on the respondent's own production experience; input-output ratio calculations; wastage determinations; GOI deficiency letters; and documents requiring payment of duties on imports not consumed in exported products — is present in ATC's verified record. ATC Verification Report at 5-7 (C.R. 40). Commerce identified no deficiency in any of these. *See* Final IDM at 25-27 (P.R. 28).

Nor did Commerce point to an EODC as validating the GOI's examination of BKT. In fact, its AAP analysis of BKT ***does not even mention an EODC***. Prelim IDM at 15 (P.R. 63); Final IDM at 24-25, 34-35 (P.R. 28). Likewise, this Court's decision sustaining Commerce's prior BKT finding was not contingent on the issuance of an EODC. *Titan Tire*, 799 F. Supp. 3d at 1324-25. If the issuance of an EODC is what marks satisfaction of Section 351.519(a)(4), Commerce has never explained how BKT satisfied the provision without one. If it is not, Commerce has never explained why ATC's exemptions depend on it.

Either way, Commerce has given "insufficient reasons for treating similar situations differently." *Kaptan Demir*, 633 F. Supp. 3d at 1284-85. By measuring ATC against another respondent's conduct rather than evaluating the examination actually conducted for ATC, Commerce compounded the error. Because Commerce "cannot simply ignore the facts of a particular record on the basis that it has seen similar situations," *Kaptan Demir*, 633 F. Supp. 3d at 1284-85, a finding that disregards the verified evidence of such examination is unsupported by substantial evidence. *CS Wind*, 832 F.3d at 1373.

Nor can Commerce suddenly claim that BKT's on-site DGFT exercise is a regulatory requirement. In *Titan Tire*, this Court declined to require more, observing that "even though the DGFT visited only one of BKT's three plants, the auditors received electronic access to records from all three plants," and that "Commerce's own methods for verification do not require the agency to visit every site for every respondent." 799 F. Supp. 3d at 1326. If a single-facility exercise supported by electronic access satisfies Commerce's regulation because the substance of the examination is adequate, Commerce cannot elevate the on-site visit itself into the test without, at a minimum, explaining why. It offered no such explanation here. If neither a respondent nor

this Court can determine what Section 351.519(a)(4) requires, then Commerce's analysis requires remand. *See CS Wind*, 832 F.3d at 1379-80.

**5. In the alternative, Commerce was required to treat the unresolved exemptions as contingent-liability interest-free loans**

Even if the Court does not reach whether the GOI's examination satisfies Section 351.519(a)(4), Commerce's measurement of the benefit independently requires remand. Commerce calculated the benefit "equal to the entire amount of an exemption in accordance with 19 CFR 351.505(e)(2)." Final IDM at 27 (P.R. 28). But paragraph (e)(2) converts a contingent-liability interest-free loan into a grant only once the contingency is no longer viable, or the recipient has failed the condition and the government has not pursued collection. 19 C.F.R. § 351.505(e)(2).

As long as the contingency remains live, paragraph (e)(1) directs Commerce to treat the outstanding balance as an interest-free loan and to measure the benefit accordingly. 19 C.F.R. § 351.505(e)(1). Indeed, Commerce's own rationale presupposes a live contingency — i.e., that it could not determine whether the exempted inputs were consumed in exported merchandise until the GOI issued the EODC. Final IDM at 26 (P.R. 28). Yet the same duty exemptions cannot remain unresolved for purposes of defeating ATC's non-countervailability argument on one hand, and simultaneously be final for purposes of measuring the benefit as a grant of the full principal on the other.

Commerce's own treatment of analogous benefits in this review confirms the point. For ATC's SEZ and EOU raw material duty exemptions, Commerce corrected its preliminary approach precisely because the exemptions "were not yet finalized," explaining that the benefit should be measured as the interest payable on the liability during the POR. *See* **Section II.B.2** *supra*. Commerce likewise treated unwaived liabilities under the EPCGS as interest-free loans, measuring the benefit as the interest the respondent would have paid had it borrowed the exempted

amount. Prelim IDM at 18 (P.R. 63). Commerce thus applied interest-only treatment to two other unfinalized duty-exemption programs in this very review, while applying full-principal treatment to the AAP on the same premise of non-finalization, without explanation. *Kaptan Demir*, 633 F. Supp. 3d at 1284-85 (Commerce acts arbitrarily when it offers insufficient reasons for treating similar situations differently).

Commerce's stated reason for rejecting loan treatment — that "the GOI has not taken meaningful action to examine whether ATC claimed duty exemptions in excess of the quantity provided or to collect repayment," Final IDM at 26 (P.R. 28), is also unsupported by substantial evidence. That is, Commerce ignored the collection mechanism ***that it had itself verified***: the bank guarantees ATC must furnish to Indian customs authorities to cover the exempted duties, which Commerce requested and tied to specific licenses. ATC Verification Report at 7 (C.R. 40). Security held by the customs authority against the exempted duties is evidence that the GOI has secured collection, and the *Final Results* do not mention it. Nor do the two facts that Commerce cited support the inference that it drew. Specifically, (1) administrative delay in processing a pending EODC application and (2) the GOI's failure to prompt ATC to submit EODC applications on other licenses, are evidence concerning the speed of processing — not that the GOI has forgiven the underlying liability, released the bank guarantees, or abandoned collection. *Cf. CS Wind*, 832 F.3d at 1374 (reversing where "there is no evidence" supporting the single inference on which Commerce relied).

Finally, full-principal treatment countervails the wrong amount under either outcome. Section 701(a) of the Tariff Act of 1930 (the "Act") directs that the duty imposed be "equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671(a). If ATC over-claimed an exemption, the GOI requires repayment with interest, ATC Case Brief at 14 (C.R. 19); ATC

Section III IQR at 8 (C.R. 219), and Commerce's methodology would impose a countervailing duty measured by an amount ATC was not permitted to retain. Conversely, if ATC did not over-claim, then the exemptions it retains are those associated with inputs consumed in exported merchandise, which Section 351.519(a)(1)(ii) excludes from the benefit altogether.

Either way, the figure Commerce countervailed is not the net countervailable subsidy. Countervailing "a greater benefit than that actually received" imposes a duty that is not "equal to the amount of the net subsidy," *Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1174-75 (Fed. Cir. 1998), and disregards Commerce's "duty to determine rates as accurately as possible{.}" *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2021). Because Commerce's methodology produces a rate untethered from any amount ATC received and retained, it exceeds the remedial measure prescribed by Section 1671(a).

**B. Commerce's SEZ and EOU Raw Material Benefit Calculation Was Unsupported by Substantial Evidence and Contrary to Law**

Commerce's final calculation measures the benefit from ATC's SEZ and EOU raw material duty exemptions accrued across an open five-year block, plus, for the first time, closed-block exemptions. Final IDM at 16-19 (P.R. 28). Commerce justified those changes by a combination of mischaracterizing its POR6 determination and a conclusory assertion, while declaring "moot" the recurring-versus-non-recurring benefit question that determines whether pre-POR exemptions may be reached at all. Commerce never otherwise addressed ATC's argument that verified export and domestic sales data bear on how much of the exemptions extended to inputs not consumed in exported production.

Each defect independently requires remand. Commerce's reliance on a mischaracterization of its POR6 determination, and failure to engage the verified export and domestic sales data, render

the calculation unsupported by substantial evidence. Its unexplained departure from the methodology applied in two prior reviews, and failure to provide the methodological explanation and response to relevant arguments required by 19 U.S.C. § 1677f(i) further render the calculation contrary to law.

**1. Commerce's expansion of the raw material measurement period cannot be sustained on the grounds provided**

**a. Commerce departed from a methodology it had applied in two consecutive reviews**

Commerce does not dispute that it changed its methodology as to the open block period. It asserted that its prior calculations "erroneously captured only the interest on exemptions during those prior POR," and acknowledged that its new approach was "new for this review." Final IDM at 16 (P.R. 28). As to closed blocks, Commerce did not acknowledge any change at all.

"{I}f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom," *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004), and "{w}hen an agency changes its practice, it is obligated to provide an adequate explanation for the change{.}" *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). Commerce therefore bore the burden of acknowledging each departure and explaining it by reference to the governing regulations and the POR7 record. As demonstrated below, it offered only a mischaracterization of its POR6 determination and a threadbare conclusion for the open-block change, and no explanation for the closed-block change. Neither satisfies the standard set forth in *Save Domestic Oil* or *SKF USA*.

**b. Commerce's account of its POR6 determination is contradicted by that determination**

In the *Final Results*, Commerce asserted that it had "clearly noted this error in the final results of the prior review" and had said it would collect the additional data "in order {to} remedy the calculation error." Final IDM at 16-17 (P.R. 28). Commerce said no such thing in the POR6 review. Rather, when confronted with Petitioner's request to expand the scope of covered raw material exemptions there, Commerce rejected that request solely because the data were not on the record; Commerce had not requested them, and there was no evidence that ATC failed to cooperate, such that "the issue {was} moot." POR6 Final IDM at 14; *see* **Section II.B.1** *supra*. Commerce merely added that it would "collect this information for subsequent administrative reviews." *Id.*

A finding that an issue is moot for want of data is not a finding that the existing methodology was wrong, let alone an explanation of why. Nor does a statement that data will be collected later amount to announcing a change in methodology. Commerce declined to reach the merits of Petitioner's request in the POR6 review, and cannot recast that refusal in POR7 as a self-identified error serving as the explanation required by 19 U.S.C. § 1677f(i)(2)(A)(iii)(I) and *SKF USA*. Commerce's explanation must show why it departed from established practice and why the new methodology is a reasonable one. *See Mid Continent Steel & Wire*, 940 F.3d at 667; *Save Domestic Oil*, 357 F.3d at 1283-84. A determination resting on a premise that is wholly contradicted by the record to which that premise cites lacks the "rational connection between the facts found and the choices made" required by the substantial evidence standard. *State Farm*, 463 U.S. at 43.

**c. Commerce's remaining rationale is conclusory and does not address the closed-block change**

Commerce's other stated ground, i.e., that the prior methodology "did not adequately capture the benefit," Final IDM at 16 (P.R. 28), announces a result rather than explaining one.

That statement does not identify which provision of Section(s) 351.505(e), 351.519, or 351.524 the prior approach misapplied; explain why exemptions accrued in earlier years of an open block are a POR7 benefit; address the closed-block change at all; or resolve whether those exemptions are recurring or non-recurring benefits — the question that determines how they may be measured, which Commerce declared "moot." *Id.* at 17.

Commerce's statement that the prior methodology was inadequate, unaccompanied by any reasoning tying that conclusion to the governing regulations or the record, "is a mere conclusion," *Mid Continent Steel & Wire*, 940 F.3d at 674, and does not supply the "adequate explanation" an agency must give when it changes its practice, *SKF USA*, 630 F.3d at 1373 — rendering it contrary to law.

**d. Commerce declined to decide the predicate recurring/non-recurring benefit question**

Under 19 C.F.R. § 351.524(c)(1), a recurring benefit is expensed in the year of receipt, whereas under Section 351.524(b)(1), a non-recurring benefit is generally allocated over the average useful life period. The characterization of a benefit as recurring or not thus controls the measurement period: if raw material exemptions are recurring, the benefit is confined to the amount received in the POR. And if they are non-recurring, exemptions from earlier years may be allocated to the POR — which is what the expanded base and the closed-block inclusion presuppose.

Commerce treated the exemptions as recurring in the *Preliminary Results*, then abandoned that treatment and declared the question "moot" because it was "no longer expensing the total exemption amount as a recurring grant in the POR." Final IDM at 17 (P.R. 28); *see* **Section II.C.4** *supra*. But the question of recurrence never turned on how Commerce structured its preliminary calculation; it determines whether raw material exemptions received before the POR may be

counted in the POR7 benefit at all. Reverting to interest-based treatment did not answer that question. It presented it.

ATC takes no position on whether these exemptions are properly characterized as recurring or non-recurring. But Commerce must make such a determination, because its expanded measurement period for the raw material exemptions cannot be justified without it. Reaching a methodological result while expressly declining to decide the predicate legal question provides neither "a full explanation of the methodology used in establishing the amount," 19 U.S.C. § 1677f(i)(2)(A)(iii)(I), nor one adequate for the Court to assess its reasonableness. *See Mid Continent Steel & Wire*, 940 F.3d at 667.

Because one of Commerce's two stated reasons mischaracterizes the POR6 determination and the other is conclusory, neither supplies the reasoned explanation required by 19 U.S.C. § 1677f(i)(2)(A)(iii)(I) and *SKF USA*. The Court may sustain the expanded measurement period only on the grounds Commerce actually invoked. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020); *CS Wind*, 832 F.3d at 1376. Those grounds cannot support Commerce's determination. Commerce's expansion of the raw material measurement period is therefore unsupported by substantial evidence and contrary to law. On remand, Commerce may elaborate the reasons it actually gave, but it may not substitute new ones. *See Regents*, 591 U.S. at 20-21.

**2. Commerce did not address ATC's argument that the verified record bears on the portion of the exemptions extending to inputs not consumed in exported production**

Section 351.519 implements 19 U.S.C. § 1671(a) for import duty exemptions in two steps. First, paragraph (a)(1)(ii) defines the benefit: "a benefit exists ***to the extent that*** the exemption extends to inputs that are not consumed in the production of the exported product." 19 C.F.R. § 351.519(a)(1)(ii) (emphasis added). Exemptions on inputs consumed in exported merchandise are

therefore not a benefit at all. Second, paragraphs (a)(3) and (a)(4) address measurement. Ordinarily, Commerce calculates "the import charges that otherwise would have been paid on the inputs not consumed in the production of the exported product." *Id.* § 351.519(a)(3)(ii). Where no governmental system or examination confirms which inputs were consumed, that calculation cannot readily be made, and "{n}otwithstanding paragraph (a)(3)," Commerce "will consider the entire amount of an exemption . . . to confer a benefit." *Id.* § 351.519(a)(4).

Paragraph (a)(4) thus displaces the calculation rule in paragraph (a)(3), not the definition in paragraph (a)(1)(ii); it is a measurement default, not a redefinition of the benefit. Read that way, Commerce's regulation remains consistent with the statutory requirement that the duty equal the net countervailable subsidy. 19 U.S.C. §§ 1671(a), 1677(5)(B).

Commerce's response to ATC inverted that structure. Commerce stated that ATC "misapplies 19 CFR 351.519(a)(1)(ii), as an exception is explained in 19 CFR 351.519(a)(4)." Final IDM at 15 (P.R. 28). But paragraph (a)(4) is not an exception to paragraph (a)(1)(ii). By treating it as one, Commerce assumed that ATC's argument had been answered simply because a default existed. ATC's argument concerned how much of the exemptions extended to inputs not consumed in exported production — the very question paragraph (a)(1)(ii) poses — and Commerce never engaged the record evidence that addresses this issue.

ATC does not contend that the GOI maintains a qualifying system; that paragraph (a)(4) is inapplicable or fails to set the entire amount as the ordinary measure absent such a system; or that Commerce was required to adopt ATC's allocation. Nevertheless, because paragraph (a)(4) is a default adopted for want of information, ATC's argument that verified record evidence establishes that the default substantially overstates the benefit was a relevant argument Commerce had to

address — by using the verified sales data or other record information, or by explaining why those data are unreliable. Commerce did neither.

The verified data established that [ ] percent of subject merchandise sales from the SEZ and EOU units were export sales, leaving just [ ] percent of sales as domestic sales. *See* **Section II.C.2** *supra*. Commerce did not find those data unreliable; did not find the proposed allocation methodologically unsound; and did not explain why the destination of the units' production was immaterial to the amount of the exemptions extending to inputs not consumed in exported production. *See* Final IDM at 15-17 (P.R. 28). Identifying the applicable provision is not the same as explaining the benefit amount Commerce calculated under it.

Under 19 U.S.C. § 1677f(i)(2)(A)(iii)(I), Commerce must set out "the amount of the countervailable subsidy established and a full explanation of the methodology used in establishing the amount{.}" And, under Section 1677f(i)(3)(A), Commerce must provide an explanation that "addresses relevant arguments" concerning the establishment of a countervailable subsidy. These are affirmative statutory duties, and a determination that does not satisfy them is contrary to law. *See Matra Ams., LLC v. United States*, 703 F. Supp. 3d 1371, 1399 (Ct. Int'l Trade 2024) (obligation to explain a methodology "stems in part from a statutory directive" in Section 1677f(i)(3)(A)). The same omission renders the determination unsupported by substantial evidence. *CS Wind*, 832 F.3d at 1373 (substantial-evidence review must account for detracting record evidence).

Additionally, the export-versus-domestic distinction is clearly evident on the record, as verified by Commerce. *See* ATC Verification Report at 1-2, 4-5 (C.R. 40). Although Commerce need not trace benefits in every case, a respondent's documentation "that allows Commerce to

separate" the non-countervailable portion of an amount is precisely what, per the Federal Circuit, Commerce may not disregard. *Kajaria*, 156 F.3d at 1175-76.

Because Section 1671(a) authorizes a duty only in the amount of the net countervailable subsidy, a figure reached without applying the Section 351.519(a)(1)(ii) baseline has not been shown to reflect that amount. *Içdaş*, 498 F. Supp. 3d at 1353; *Mid Continent Steel & Wire*, 940 F.3d at 667.

To justify countervailing the entire amount, Commerce cited only *Royal Thai Government v. United States*, 436 F.3d 1330 (Fed. Cir. 2006). Final IDM at 17 (P.R. 28). But in that case, the Federal Circuit deferred to fact-specific findings that the Thai system "did not isolate and examine what was consumed in the production of the exported products," and systematically allowed "unduly large amounts of impermissible drawback." *Royal Thai*, 436 F.3d at 1339-40. The court also observed that Commerce "might countervail only excess drawback" where the excess "is relatively very small." *Id.* Commerce made no comparable findings here, and citing *Royal Thai Government* is not a substitute for making them.

### C. Commerce's Rejection of ATC's EPCGS Corrections and Application of AFA Was Unsupported by Substantial Evidence and Contrary to Law

Commerce applied AFA to ATC's entire EPCGS benefit because ATC's records understated the exempted duties and Commerce declined to accept the correction ATC tendered at verification. Final IDM at 36-39 (P.R. 28). That determination is neither supported by substantial evidence nor in accordance with law. Commerce rejected corrective information without weighing accuracy against finality, as required by Federal Circuit precedent, even though its own verification agenda had solicited precisely that submission and Commerce accessed the very portal against which the correction was reconciled. Commerce then treated the resulting gap

as the basis for facts available, and selected an adverse inference without making the separate finding that ATC had failed to cooperate to the best of its ability.

**1. Commerce rejected ATC's correction without weighing accuracy against finality**

No statute or regulation governs whether Commerce must accept a respondent's correction of its own reporting. *See Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1352-53 (Fed. Cir. 2006). Commerce accordingly has discretion to accept or reject corrective information case by case, but "Commerce's discretion has limits." *Goodluck*, 11 F.4th at 1342. And "Commerce is free to correct *any* type of importer error — clerical, methodology, substantive, or one in judgment — . . . provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections." *Timken*, 434 F.3d at 1353 (emphasis added).

Commerce's practice of accepting only "minor corrections" at verification is a means of striking that balance, not a substitute for it. Where a correction offered at verification creates "a tension between finality and correct result," Commerce "must determine whether the need for finality outweighs the need for accuracy," and the Federal Circuit has recognized that Commerce "cannot reject corrective information at a preliminary determination stage (where there are no finality concerns)," provided that the corrections are otherwise justifiably necessary. *Goodluck*, 11 F.4th at 1342-43 (quotation marks omitted). Unlike the systemic, calculation-wide misreporting sustained in *Goodluck*, ATC's correction was discrete, self-identified, reconciled to the GOI's own portal, and tendered before the *Preliminary Results*. As the Federal Circuit has explained, "preliminary determinations are 'preliminary' precisely because they are subject to change." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

This Court has applied those principles where Commerce rests a rejection on the character of the error rather than on that balance. In *Pro-Team Coil Nail Enterprise, Inc. v. United States*, the Court held that Commerce "erred in disregarding *NTN Bearing* and *Timken* based on the agency's conclusion that {the respondent} had not made a clerical error." 419 F. Supp. 3d 1319, 1331-32 (Ct. Int'l Trade 2019). In reviewing such a rejection, the Court considers "Commerce's interest in ensuring finality, the burden of incorporating the information, and . . . whether the information will increase the accuracy of the calculated {rates}," an evaluation that has led the Court to remand refusals to consider corrective information, "including information to correct an omission," submitted early in a proceeding. *Id.* at 1332 (quotation marks omitted). Because Commerce "failed to balance finality and accuracy considerations before dismissing" the corrected data, the Court remanded. *Id.* at 1334.

Commerce made the same error here. Its sole stated reason for rejecting ATC's correction was magnitude: that ATC had understated non-cenvatable duties by [ ] and [ ] percent in the two years at issue. ATC Verification Report at 18 (C.R. 40); Prelim IDM at 8-9 (P.R. 63); Final IDM at 36-39 (P.R. 28). That conclusion addresses only whether the correction fit Commerce's label of being "minor." It does not weigh finality, burden, or accuracy, and each, as demonstrated below, favors ATC.

Finality was not implicated: ATC's correction and Commerce's subsequent verification preceded the *Preliminary Results* by roughly two months — earlier in the proceeding than the corrections at issue in *NTN Bearing*, *Timken*, or *Pro-Team*. The burden was modest: the correction concerned discrete, license-level amounts under a single program, each supported by documentation and reconciled to the GOI's EPCGS portal, which Commerce verifiers later consulted. And, accuracy weighed decisively in favor of acceptance: the portal is the GOI's own

record of ATC's EPCGS licenses, so a correction reconciled to it would have aligned ATC's reported figures with the very source that Commerce treated as authoritative. Rejecting the correction instead left Commerce with figures it knew were understated, which it then discarded in favor of another respondent's rate. Yet, the countervailing duty laws are "remedial not punitive," and "it is unreasonable to require perfection." *NTN Bearing*, 74 F.3d at 1208.

Commerce's conduct confirms that the correction was neither burdensome nor beyond verification. After declining ATC's corrected data, Commerce verifiers later accessed the GOI's EPCGS portal — the very database against which ATC had reconciled the correction — to examine ATC's EPCGS reporting. ATC Verification Exhibits at VE-6 (p. C-0012) (C.R. 117-18). Neither the verification report nor the Final IDM explains why that portal could not equally have confirmed the corrected amounts. *See* ATC Verification Report at 17-18 (C.R. 40); Final IDM at 36-39 (P.R. 28). The Federal Circuit has criticized declining to verify corrective information and then rejecting it as unverified: "If Commerce had reason to doubt {the} corrective information, then it could have, and perhaps should have, performed a second verification." *Timken*, 434 F.3d at 1354. No second verification was needed here. Commerce's statement that it "was not able to fully verify ATC's reporting of EPCGS," ATC Verification Report at 18 (C.R. 40), describes a limitation of its own making.

A rejection resting solely on the conclusion that a correction is not "minor," without the weighing that *NTN Bearing*, *Timken*, *Goodluck*, and *Pro-Team* require, is an abuse of discretion and contrary to law. *Pro-Team*, 419 F. Supp. 3d at 1331-34. And because Commerce made no findings on burden, feasibility, or accuracy, and never reconciled its rejection with its own use of the portal, its rejection also lacks the reasoned connection to the record that substantial evidence requires. *See CS Wind*, 832 F.3d at 1376.

**2. Commerce did not establish a threshold basis for facts available**

Facts available are permitted only if, per 19 U.S.C. § 1677e(a), necessary information is not on the record or an interested party withheld requested information, failed to provide it by the applicable deadline or in the form and manner requested, significantly impeded the proceeding, or provided information that could not be verified. Those are distinct findings; they cannot be collapsed into a general conclusion that a response was incomplete.

Commerce made none of these statutorily required findings as to ATC. ATC reported the EPCGS program, answered Commerce's questionnaires, participated in verification, and, as Commerce's verification agenda directed, tendered the corrected entries at the outset of verification with license-level support and a portal reconciliation. *See* **Section II.D** *supra*. The corrected figures are absent from the record for one reason only: Commerce declined to accept them. Because that refusal was itself an abuse of discretion, *see* **Section IV.C.1** *supra*, the resulting gap is a problem of Commerce's own making, and it cannot serve as an independent predicate for facts available. *See NTN Bearing*, 74 F.3d at 1208; *Timken*, 434 F.3d at 1354.

Commerce's authority to resort to facts available "is circumscribed by 19 U.S.C. § 1677m(e)," *Pro-Team*, 419 F. Supp. 3d at 1334, which bars Commerce from declining to consider necessary information that was timely submitted, can be verified, is not so incomplete as to be unreliable, was provided by a party acting to the best of its ability, and can be used without undue difficulties. 19 U.S.C. § 1677m(e). ATC raised each criterion, ATC Case Brief at 16-27 (C.R. 19); the Final IDM addresses none. *See* Final IDM at 36-39 (P.R. 28); *Pro-Team*, 419 F. Supp. 3d at 1331 (remanding where Commerce's Section 1677m(e) conclusion was "largely conclusory").

Commerce instead stated that it "was not able to fully verify ATC's reporting of EPCGS" after declining the correction. ATC Verification Report at 18 (C.R. 40). But Commerce "cannot

simply declare that evidence on the record is unverifiable"; it must explain that the information is unverifiable "because the information is missing or otherwise deficient." *See Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1368 (Ct. Int'l Trade 2021) (quotation marks omitted). Commerce offered no such explanation, and the only limitation on verification was one of its own making. *See* **Section IV.C.1** *supra*.

Because Commerce made none of the findings required by Sections 1677e(a) and 1677m(e), and because the only gap it identified was of its own making, its resort to facts available was contrary to law. Moreover, because Commerce disregarded the record evidence of ATC's correction and its own use of the GOI's portal, that determination is likewise unsupported by substantial evidence. *See CS Wind*, 832 F.3d at 1373.

### 3. Commerce made no separate finding that ATC failed to cooperate to the best of its ability

An adverse inference requires a further finding under 19 U.S.C. § 1677e(b): that the respondent failed to cooperate by not acting to the best of its ability. The standard does not demand perfection. It calls for "a factual assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003). And an adverse inference "may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." *Id.* at 1383. The inquiry thus has two parts: objectively, whether the respondent failed to provide requested information; and subjectively, whether it failed to put forth its maximum effort to investigate and obtain that information from its own records. *Id.* at 1382-83. Commerce made neither finding.

Here, Commerce did not conduct that assessment. It merely reiterated that ATC "failed to report" certain EPCGS benefits. Prelim IDM at 9 (P.R. 63); Final IDM at 39 (P.R. 28). Yet Commerce "must do more than simply restate its findings ostensibly supporting the use of neutral facts available to support the use of adverse facts available." *Pro-Team*, 419 F. Supp. 3d at 1333. Commerce's conclusion does not explain why the error demonstrates insufficient effort, given that ATC maintained license-level records in the ordinary course of business, audited them against the GOI portal in preparing for verification, identified a discrepancy the manual records did not reveal, and disclosed it in the manner Commerce's agenda prescribed. *See* **Section II.D** *supra*. This Court remanded an adverse inference on the same basis in *Pro-Team*, where Commerce "failed to account for evidence demonstrating {the respondent's} attempts to comply" and "appear{ed} to have considered anything less than perfection as a failure to cooperate." 419 F. Supp. 3d at 1339.

*Nippon Steel* makes clear that the standard "does not condone inattentiveness, carelessness, or inadequate record keeping." 337 F.3d at 1382. But the cases sustaining the application of an adverse inference based on that language involve conduct different from that underlying this appeal. They involve respondents who maintained requested information in a separate database "and then repeatedly {did} not search{} that database," *Guizhou Tyre*, 523 F. Supp. 3d at 1352, or who failed to provide information Commerce had twice requested after a supplemental questionnaire notified them of the defect. *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017). ATC was never notified of a deficiency in its EPCGS reporting, never persisted in a defective response, and never disregarded a source Commerce had repeatedly asked it to search. It identified the discrepancy itself and brought it forward.

Commerce's own practice confirms that whether a correction is minor and whether an adverse inference is warranted are distinct questions. In *Polyester Textured Yarn from India*,

Commerce rejected revised EPCGS data as non-minor and did not verify it, but calculated the benefit from verified exemption values already on the record rather than applying AFA. *Polyester Textured Yarn From India: Final Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 63,848 (Nov. 19, 2019), and accompanying Issues and Decision Memorandum at 29-30; *see* ATC Case Brief at 27 nn.63-64 (C.R. 19). Commerce neither acknowledged nor explained its departure from that approach here. *See Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce must provide a "reasonable explanation" when it acts differently than in similar circumstances).

Commerce's inference also rests on a shortfall of its own making: the only deficiency on which it drew the inference was the gap left by its refusal of ATC's correction. *See* **Sections IV.C.1-IV.C.2** *supra*. Because Commerce neither conducted the assessment *Nippon Steel* requires, nor engaged ATC's actual conduct, its application of an adverse inference is unsupported by substantial evidence. *See Pro-Team*, 419 F. Supp. 3d at 1339-40.

### D. Commerce's Water LTAR Determination Rested on an Inverted Reading of the GIDC Regulation

Commerce concluded that ATC purchased water for LTAR based on a single premise: that because consumers outside the GIDC area pay twice the estate rate, ATC's estate rate is a 50 percent discount. Final IDM at 41 (P.R. 28). That premise inverts the governing Indian regulation ("GIDC Regulation"). Article 5 fixes the estate rate as the baseline, and Article 17 doubles it as a surcharge on an exceptional class of transactions, as Commerce verifiers described and Commerce never addressed. Commerce also identified no benchmark reflecting prevailing market conditions, as 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511 require before a provision of goods may be found inadequately remunerated.

#### 1. Record evidence and Commerce's verification findings contradict its benefit determination

The GIDC Regulation operates in a fixed sequence: Article 5 sets the charge within an industrial estate at the rate fixed by GIDC, while Article 17 directs that a consumer outside GIDC's territorial limits pays double "the prevailing rate" — i.e., double the Article 5 rate. *See* **Section II.E** *supra*.

Commerce's determination requires reading the GIDC Regulation backwards. It treats the Article 17 charge as the ordinary price and the Article 5 rate as a 50 percent discount, which is not what the text says and not how the two provisions relate. A markup imposed on an extraordinary transaction does not establish that the baseline transaction is inadequately remunerated. Commerce verifiers reported that "plants located outside of the GIDC area are charged at a 100 percent markup." ATC Verification Report at 20 (C.R. 40). A markup above the prescribed rate is the opposite of a discount to it.

The *Final Results* fail to account for this. Commerce was obliged to address record evidence that detracts from its premise, *Diamond Sawblades*, 219 F. Supp. 3d at 1375, and substantiality "must take into account whatever in the record fairly detracts from its weight," *CS Wind*, 832 F.3d at 1373. A determination that rests on a premise contradicted by its own verification record lacks the "rational connection between the facts found and the choices made" required by the substantial evidence standard. *State Farm*, 463 U.S. at 43.

**2. Commerce identified no benchmark reflecting prevailing market conditions**

A countervailable benefit arises from the provision of a good only "to the extent that such goods or services are provided for less than adequate remuneration," and adequacy is measured "in relation to prevailing market conditions for the good . . . in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv); *see* 19 C.F.R. § 351.511(a)(2).

The Article 17 charge cannot serve as that measure. It applies only when GIDC supplies water beyond the limits of its estates — a transaction differing in location, connection, infrastructure, and service. Commerce did not find that an outside-area consumer receives water under conditions comparable to ATC's in-estate purchase, nor that the doubled charge reflects the market value of water rather than a territorial surcharge. Prelim IDM at 22-23 (P.R. 63). Nor did Commerce point to any evidence that GIDC reduced ATC's rate from an otherwise applicable price; that the Article 5 rate fails to cover GIDC's costs; or that comparable industrial users elsewhere in India pay more — a deficiency that ATC raised before Commerce. ATC Case Brief at 27–29 (C.R. 19). Commerce cannot rely on price discrimination to the exclusion of a thorough evaluation of market principles. *See POSCO v. United States*, 977 F.3d 1369, 1376–78 (Fed. Cir. 2020) (finding Commerce's analysis unsupported where Commerce failed to request and investigate relevant cost information). By adopting the exceptional rate as the benchmark without explaining why it supplies an appropriate comparison under prevailing market conditions, Commerce assumed the proposition it was required to prove, and its benefit finding is unsupported by substantial evidence.

**E. Commerce's Amended Final Results Failed to Remove the Duplicated 2021 EOU Amount**

Commerce's amended final calculations count the same 2021 EOU [ ] amounts twice, and Commerce declined to correct the duplication on the ground that its decision to include those duties in the benefit numerator was intentional. **Section II.E** *supra*. That conclusion addresses a different allegation. Whether to include the [ ] at all is a methodological question; whether to include them twice is not. Commerce never explained how counting the same amounts twice reflects any methodology, and none could: the resulting duty is

not "equal to the amount of the net subsidy." *Kajaria*, 156 F.3d at 1175 (quoting 19 U.S.C. § 1671(a)).

**1. Commerce's stated ground for declining correction does not address the duplication**

Commerce's position rests on the distinction between methodological and clerical decisions. Section 751(h) of the Act and 19 C.F.R. § 351.224(f) define a ministerial error to include a "clerical error resulting from inaccurate copying, duplication, or the like." An allegation directed at a methodological choice does not qualify. *See Alloy Piping Prods., Inc. v. United States*, 201 F. Supp. 2d 1267, 1284-85 (Ct. Int'l Trade 2002).

Along these lines, Commerce stated that its change to the benefit calculation "was intentional"; was made "to correct an error in the Preliminary Results calculations consistent with our past practices for these programs in previous segments"; and that consequently there was "no discrepancy between Commerce's stated intention and the data on which we relied." Amended Final IDM at 2-4 (P.R. 12). Each of those statements concerns the decision to include the [ ] amounts in the numerator, not the number of times they were included.

ATC's rebuttal comments, by contrast, identified a discrete arithmetic problem: in 2021, and only in 2021, the same amounts entered the EOU raw material exemption calculation twice. ATC Ministerial Error Rebuttal Comments at 5-7 and Exhibit ME-2 (C.R. 5-6). Commerce never addressed that allegation. Amended Final IDM at 2-4 (P.R. 12). On Commerce's own test, the duplication is correctable: Commerce's stated intention was to include the [ ] once, consistent with the practice it applied in the POR6 review, but the data on which it relied included them twice. That is the very discrepancy Commerce said was absent. A duplication of this kind falls within the literal terms of Section 351.224(f), which names "duplication" among the errors Commerce's regulation reaches.

Moreover, because the duplication is apparent on the face of Commerce's own calculations, its persistence is itself a government error that Commerce was required to correct. *See ABB, Inc. v. United States*, 273 F. Supp. 3d 1200, 1211-12 (Ct. Int'l Trade 2017) (where "an error is apparent (or should have been apparent) from the face of the calculation or from the final determination itself and goes uncorrected, that error, in effect, becomes a government error and, hence, a 'ministerial' error, and the government is required to correct it") (quoting *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292 (Fed. Cir. 2003)).

Commerce's treatment of the other allegations in the same memorandum underscores the point. Commerce agreed that it had "inadvertently" failed to capture the full SEZ and EOU benefit and had "inadvertently" treated the Section 10AA loan for an incorrect period, and corrected both. Amended Final IDM at 5-7 (P.R. 12). Because the 2021 duplication is the same type of error and Commerce offered no reason for treating it differently, its determination is unreasonable. *Kaptan Demir*, 633 F. Supp. 3d at 1284-85.

**2. Record evidence confirms the duplication at issue**

The duplication is apparent from the record data on which Commerce relied. For each 2021 entry subject to [ ], ATC's reported EOU import data list the individual exempted duties, including the [ ], together with a total that already sums those components. ATC Ministerial Error Rebuttal Comments at Exhibit ME-2 (C.R. 5) (Exhibit EOU 18). The data then repeat the [ ] in a separate column. *Id.* Commerce's 2021 calculation captured the [ ] through both. Final Calculation Memorandum at Attachment II (C.R. 10); ATC Ministerial Error Rebuttal Comments at 6 (C.R. 6).

The arithmetic further confirms the duplication. Commerce's final 2021 EOU raw material figure was [ ]. Removing the [ ] once yields [ ]; removing them entirely yields [ ]. ATC Ministerial Error

Comments at 3 (C.R. 8); ATC Ministerial Error Rebuttal Comments at 6 (C.R. 6). The gap between Commerce's figure and the [ ]-free figure, [ ], is exactly twice the year's [ ] amount of [ ]. Commerce's 2021 figure therefore contains the same [ ] twice.

Removing only the duplicated amount lowers ATC's EOU rate by approximately [ ] percentage points. *Compare* ATC Ministerial Error Comments at Exhibit ME-1 (C.R. 9)(EOU rate of [ ] percent) with ATC Ministerial Error Rebuttal Comments at Exhibit ME-2 (C.R. 5) (EOU rate of [ ] percent).

## V. CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiff respectfully requests that the Court:

1) Enter judgment in favor of Plaintiff;
2) Hold and declare that Commerce's decision to countervail the entire amount of ATC's AAP import duty exemptions, and in the alternative its measurement of that benefit as a grant rather than a contingent-liability interest-free loan, was unsupported by substantial evidence and contrary to law;
3) Hold and declare that Commerce's expansion of the SEZ and EOU raw material measurement period, and its refusal to address relevant, verified sales data, were unsupported by substantial evidence and contrary to law;
4) Hold and declare that Commerce's rejection of ATC's EPCGS corrections and its application of AFA were unsupported by substantial evidence and contrary to law;
5) Hold and declare that Commerce's finding that ATC purchased water for LTAR was unsupported by substantial evidence and contrary to law;
6) Hold and declare that Commerce's refusal to remove the duplicated 2021 EOU [ ] amounts was contrary to law;

7) Remand this matter to Commerce to reconsider the *Final Results* and *Amended Final Results* and to issue revised final results in conformity with the Court's decision; and

8) Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Eric C. Emerson
Eric C. Emerson
Ron Kendler
Christopher G. Forsgren
Nicole Arellano-Brillembourg

STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

Attorney for Plaintiff ATC Tires Private Ltd.

October 22, 2026

**CERTIFICATE OF COMPLIANCE**

I, Eric C. Emerson, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures. The word count for the opening brief in support of ATC's Rule 56.2 Motion for Judgment Upon the Agency Recorded, as computed by the Steptoe LLP word processing system (Microsoft Word for Microsoft 365 MSO) is 13,945.

/s/ Eric C. Emerson
Eric C. Emerson, Esq.
(Lead Attorney)